# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHAWN M. MITCHELL,          :     **No. 3:05cv2122**
       **Plaintiff**          :

                        :     **(Judge Munley)**
     **v.**                 :     **(Magistrate Judge Smyser)**
                        :

JO ANNE BARNHART,       :
COMMISSIONER OF SOCIAL  :
SECURITY,              :
       **Defendant**       :

## MEMORANDUM

Before the court for disposition is Magistrate Judge J. Andrew Smyser's report and recommendation suggesting that the instant social security appeal should be denied. Plaintiff Shawn M. Mitchell has filed objections to the report and recommendation. The matter has been fully briefed and is ripe for disposition. For the reasons that follow, we will adopt the report and recommendation, and deny the plaintiff's appeal.

**Background**

Plaintiff Shawn M. Mitchell appeals from the Commissioner of Social Security's decision to deny him disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff applied for disability benefits on March 24, 2004, alleging that diabetes mellitus and related neuropathy had rendered him disabled, beginning on July 1, 2002. (Record (hereinafter "R.") at 23, 144-46, 359-61). The

Commissioner initially denied his application, after which plaintiff requested a hearing. (Id. at 92, 99-102, 353-58).  An Administrative Law Judge (ALJ) held a hearing on May 10, 2005.  (Id. at 20-91, 98).  After this hearing, the plaintiff amended his alleged onset date to June 29, 2004.  (Id. at 134).  The ALJ denied the plaintiff's claims on June 17, 2004).  (Id. at 10-19).  When the Social Security Appeals Council denied the plaintiff's appeal, the ALJ's decision became final under the rules articulated in 42 U.S.C. § 405(g).  (Id. at 5-9, 378-86).  A party may appeal a final decision of the Social Security Commissioner to this court.  Id.  The plaintiff appealed, and Magistrate Judge Smyser recommended that this court uphold the Commissioner's decision.  The plaintiff objected to the Magistrate Judge's report and recommendation.  Those objections are now before this court.

**Jurisdiction**

We have jurisdiction over the instant action pursuant to 42 U.S.C. § 405 (g).[1]

**Standard of Review**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v.

---

[1]"Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.  Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has the principal place of business."  42 U.S.C. § 405(g).

Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court may also receive further evidence or recommit the matter to the magistrate judge with instructions.  Id.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace.  In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that a person must "not only [be] unable to do this previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A); Heckler v.

3

Campbell, 461 U.S. 458, 459-60 (1983).

In analyzing disability claims, the Commissioner employs a five-step sequential evaluation.  20 C.F.R. § 416.920.  The initial three steps are as follows: 1) whether the applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe impairment; 3) whether the applicant's impairment meets or equals an impairment listed by the Secretary of Health and Human Services as creating a presumption of disability.   If claimant's impairment does not meet requirement 3, the claimant must demonstrate 4) that the impairment prevents him from doing past relevant work. See 20 C.F.R. §§ 404.1520, 416.920.  If the applicant establishes steps one through four, then the burden is on the Commissioner to demonstrate the final step:  5) that jobs exist in the national economy that the claimant can perform.  Jesurum v. Secretary of the U.S. Dept. of Health and Human Services, 48 F. 3d 114, 117 (3d Cir. 1995).

Here, the ALJ noted that the plaintiff was a 32-year-old with a high school education.  (R. at 13).  He had work experience as a truck driver, material handler, driver on sales routes, kitchen helper, tile setter, audio operator, and set-up helper in a recording studio.  (Id.).  He had not engaged in substantial gainful employment since his alleged onset date.  (Id.).  The plaintiff alleged he became disabled due to diabetes mellitus, neuropathy, and depression on June 29, 2004.  (Id. at 14).  The ALJ first noted that the plaintiff's diabetes with neuropathy was "'severe' within the meaning of the Regulations."  (Id.).  Plaintiff's alleged carpal tunnel syndrome,

4

however, was not severe, since "the evidence does not show significant treatment or limitations related to it." (Id. at 15). The ALJ found that plaintiff's "depression, panic and substance abuse" were "not medically determinable impairments." (Id.). His treating physician had noted those complaints, but no evaluation from mental health professionals "confirm[ed] any mental impairment," and the plaintiff had not received any psychotherapy or been hospitalized for that condition. (Id.).

The ALJ also determined that plaintiff's condition did not meet the requirements to create a presumption of disability under the Social Security guidelines. (Id.). Though the plaintiff's diabetes was a "severe" impairment, that condition was "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4," since "the evidence does not establish that the limitations or clinical findings required of any listing are met or equaled, singly or in combination." (Id.). The plaintiff did "not have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station." (Id.). Examinations performed of motor skills on March 30, 2005 revealed "normal strength, tone and bulk," and that "gait and tandem walking are normal." The plaintiff also lacked evidence that acidosis occurred every two months for the plaintiff, and the "visual limitations required by the listings" were also not demonstrated. (Id.).

These findings required the ALJ to examine the plaintiff's "residual functional

capacity" (RFC), defined as "the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks." (Id.) (citing 20 C.F.R. §§ 404.1545 and 416.945 and Social Security Ruling 96-8p). The ALJ held that the plaintiff's RFC meant he could "perform sedentary work activity, which requires lifting and carrying up to 10 pounds and standing and/or walking up to 2 hours of an 8-hour workday, with normal breaks." (Id. at 16). The ALJ also found that plaintiff could "occasionally climb stairs and balance," but could never "use foot/leg controls bilaterally, climb ropes, ladders or scaffolding, kneel, crouch or squat or crawl." (Id.). The judge also found that plaintiff could not be exposed to loud noises, or work in high places or "around fast moving machinery on the ground." (Id.).

In making this determination, the ALJ assigned only limited weight to the plaintiff's primary care physicians' opinions on his "exertional limitations." (Id.). The ALJ found these doctors' conclusions to be "inconsistent." (Id.). The judge pointed out that in May 2004, plaintiff's doctors had found his condition required no limitations on exertion, but that by March 2005 one of those doctors found that plaintiff should be "limited to less than sedentary work." (Id.). The ALJ did not credit these conclusions, because "medical records do not show a deterioration of the claimant's condition that would justify such a difference in ability." (Id.).

The ALJ concluded that plaintiff could not perform any of his past relevant work and moved to the next question, whether there existed any other jobs existing

6

in significant numbers in the national economy which a person of plaintiff's age,
RFC, education and work experience could perform. (Id. at 17).  The ALJ found that
plaintiff's RFC, age, and work experience would allow him to perform "a significant
range of sedentary work ." (Id.).  Such jobs, the court noted, required "lifting no more
than 10 pounds at a time and occasionally lifting or carrying articles like docket files,
ledgers, and small tools." (Id.).  The worker in such a job is also required at times to
walk or stand.  (Id.).

Finding that the plaintiff could perform such sedentary work, the ALJ turned to
a vocational expert, who testified that significant employment was available to a
person with plaintiff's restrictions.  (Id. at 18).  The ALJ adopted the vocational
expert's claim that plaintiff could work as a "call out operator, with 900 jobs locally,
5,050 regionally and 152,000 nationally." (Id.).  As a result, the ALJ found that
plaintiff was not disabled under the meaning of the statute, since "considering the
claimant's age, educational background, work experience, and residual functional
capacity, he is capable of making a successful adjustment to work that exists in
significant numbers in the national economy." (Id.).

In a decision filed on May 22, 2006 Magistrate Judge J. Andrew Smyser
recommended that the ALJ's determination be upheld.  Magistrate Judge Smyser
found that the ALJ's determination that plaintiff's carpal tunnel syndrome was not
severe was supported by substantial evidence. (Report and Recommendation,
(Doc. 12) at 14).  The court noted that only one doctor had found plaintiff suffered

from the condition, and that plaintiff had never alleged problems using his hands and had never sought treatment for the condition. (Id.). The court also found that substantial evidence supported the ALJ's determination that plaintiff's depression was not a severe impairment. (Id. at 16). Plaintiff, the court found, had not sought mental health treatment for his alleged depression, and that treating physicians often noted in their reports that plaintiff exhibited normal mental health. (Id.). The Magistrate Judge also approved of the ALJ's failure to assign controlling weight to plaintiff's family doctor's opinion on his residual functional capacity. (Id.). The court found that decision immaterial, since the ALJ had adopted many of this doctor's recommendations. (Id. at 19). In any case, the medical evidence supported the ALJ's RFC assessment. (Id.). Evidence of plaintiff's daily activities, which indicated that he could drive, care for himself, and even play four-hour gigs in a rock band, meant that substantial evidence existed for this determination. (Id. at 19).

The plaintiff filed objections to the Magistrate Judge's report and recommendation, arguing that the court made three errors in upholding the decision of the ALJ. We will address each of those objections in turn.

## A. Plaintiff's Carpal Tunnel and Depression were not severe impairments as defined in the Act and the Regulations, and that Plaintiff Failed to Meet his Burden on this issue

The plaintiff argues that the Magistrate Judge erred in upholding the ALJ's decision that the carpal tunnel syndrome and depression from which plaintiff claimed

to suffer were not severe under the guidelines provided by the Social Security regulations. Social Security regulations require that a claimant demonstrate that he or she suffers from an "impairment . . . which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). The burden of production and persuasion belongs to the claimant. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987). Plaintiff contends that his complaints of carpal tunnel syndrome were confirmed by a neurologist's diagnostic testing, and that combined with frequent complaints about pain in his hands and fingers this testing demonstrates that plaintiff met his burden of demonstrating that carpal tunnel amounted to a severe impairment.

The record contains evidence that plaintiff suffered from carpal tunnel syndrome. A July 19, 2004 examination of the plaintiff by Dr. Tuan H. Vu, a neurologist, found "evidence of a co-existing right median nerve lesion at the wrist, consistent with carpal tunnel syndrome." (R. at 321). Dr. Vu also reported that "no active denervation is seen at this time." (Id.). In his April 19, 2004 application for disability benefits submitted to the Pennsylvania Bureau of Disability Determination, plaintiff complained of "weakness, pain in arms and wrist, loose [sic] strength in hands." (R. at 158). Plaintiff also reported that he could not grip objects like a hammer or drill, and could not write for longer than a few minutes. (R. at 159). Plaintiff's family physician reported to the Social Security Administration April 9, 2005 that plaintiff had difficulty fingering and feeling objects and limited manual dexterity.

9

(Id. at 313.).

We find that substantial evidence supports the ALJ's conclusion that plaintiff's claim of carpal tunnel syndrome did not amount to a severe impairment under the regulations. While one doctor's report noted a finding that plaintiff suffered some of the symptoms of the syndrome, that neurologist did not recommend any follow up treatment for the condition, and did not note any particular symptoms related to the problem. See Id. at 321. No other doctor noted the condition, and plaintiff did not receive any therapy or medication to address the problem. Plaintiff did not complain of carpal tunnel syndrome in any of his applications for benefits, to his doctors, or in his testimony before the ALJ. At the time of his application, plaintiff occasionally played guitar at a local bar with his rock band. In his testimony before the ALJ, plaintiff complained that his condition caused him to stop this activity, but did not include complaints about carpal tunnel syndrome. His fingers did not "have very good feeling in them," and this made it difficult for him to practice. (Id. at 46). Problems with his feet and legs likewise made it difficult for him to stand and perform for even an hour at a time, and the band had to take breaks to accommodate this condition. (Id. at 65). Plaintiff thus did not complain that his alleged carpal tunnel syndrome limited his ability to play guitar; he attributed his problems performing to other diabetes-related maladies. Combined with the lack of evidence of medical complaints or treatment for carpal tunnel, we find that substantial evidence existed for the ALJ to determine that plaintiff's carpal tunnel was not a severe impairment.

Plaintiff also contends that the Magistrate Judge erred in finding he had not met his burden for establishing that his mental condition amounted to a severe impairment.  He points to doctor's reports that indicate that plaintiff had been prescribed an anti-depressant, medical records that show both plaintiff and his girlfriend had complained he suffered from depression, difficulty sleeping, lack of energy and thoughts of suicide as evidence sufficient to conclude that his mental condition amounted to a severe impairment.

The plaintiff did provide evidence that he suffered bouts of depression.  On August 9, 2004, Barbara Heindel, a call center nurse, reported that plaintiff's girlfriend telephoned to report that plaintiff was suicidal and had left a suicide note. (R. at 292).  Dr. Emily Sippel, plaintiff's family physician, spoke with the plaintiff two days later.  (Id.).  The plaintiff reported that his mood was "better," and the doctor noted that plaintiff did not have any homicidal or suicidal thoughts.  (Id.).  On March 9, 2005 plaintiff had an appointment with Dr. Sippel.  (R. at 285).  Dr. Sippel reported that plaintiff's live-in girlfriend accompanied him to his visit, and that she told the doctor she was "especially concerned about his overall depressed mood and the fact that he feels so bad all day long." (Id.).  The plaintiff conceded that he felt "down in the dumps and angry about his illness."  (Id.).  He feared he would die and felt "lifeless" because of his inability to work.  (Id.).  Plaintiff also had trouble sleeping, had little interest in everyday activities, lacked energy, was forgetful and had trouble concentrating, felt restless, and had expressed "occasional suicidal ideation without

11

a plan." (Id.).  He denied any current thoughts of suicide or homicide. (Id.).  Dr.

Sippel prescribed Prozac to treat these conditions. (Id.).  None of plaintiff's other

treating physicians diagnosed depression, and plaintiff never received any

psychotherapy or mental health treatment.

Plaintiff also testified to his mental condition.  He told the ALJ that he had

"always felt a little bit depressed about having all of the complications, and having

diabetes in general." (Id. at 57).  He confessed to a desire to "hurt" himself "at

certain times," but admitted that he had not told his doctors about those feelings

because "I didn't want to seem like I had any problems like that." (Id.).  The plaintiff

had not engaged in any inpatient or outpatient mental health treatment.  (Id. at 58).

He had received no group or individual counseling. (Id.).  Dr. Sippel had not

recommended any inpatient treatment for the condition, nor had she urged the

plaintiff to undertake outpatient counseling or group therapy. (Id.).  When asked to

explain his mental condition and the impact of his depression, plaintiff testified that "I

was always angry that I had diabetes.  I was in denial for quite some time thinking

this isn't happening to me, I'm too young." (Id. at 59).  Plaintiff testified that after he

began to notice complications from his disease "it really made me hate myself." (Id.)

"On at least three occasions," plaintiff thought about "driving [his] car into a wall or

something." (Id.).  Plaintiff failed to seek treatment for these problems until March

2005 because he "didn't want anybody to think [he] was crazy." (Id.).  Once he

began taking the Prozac prescribed by Dr. Sippel, his thoughts of suicide

disappeared. (Id. at 70-71). They had not returned at the time of his hearing before the ALJ. (Id.). Plaintiff also testified that at the time of his hearing, he had difficulty dealing with complex problems and was forgetful, that he frequently lacked energy, and that he felt anxious in large crowds. (Id. at 71).

Substantial evidence existed for the ALJ to conclude that plaintiff's depression was not a severe impairment. While the plaintiff does present some evidence that he experienced depression after he began treatment for his diabetes, we note that only one of the many doctor's reports in the record contain evidence of his claims of depression and suicidal thoughts, and that plaintiff's girlfriend—and not the plaintiff himself—made the complaint. While we recognize that people experiencing mental difficulties are often loathe to acknowledge their pain, we are nonetheless convinced that plaintiff has failed to present sufficient evidence to demonstrate that his depression represented a severe impairment that significantly limited his ability to perform basic work activities. Plaintiff presents no evidence that his mental state played a role in his inability to return to work. No evidence exists in the record from which a reasonable person could conclude that plaintiff's depression prevented him from engaging in everyday activities, or that his depression had not been alleviated by medication.

**B. That the ALJ did not err in failing to give controlling weight to the treating physician's residual functional capacity (RFC) assessment**

The plaintiff next complains that the ALJ failed to give controlling weight to the

opinion of his treating physician on his residual functional capacity (RFC). That opinion, written by Dr. Emily Sippel on March 9, 2005, found that the plaintiff could occasionally lift and carry ten pounds, could frequently lift and carry less than ten pounds, could stand or walk for less than two hours in an eight-hour workday, could sit for about six hours in an eight-hour day, and had no limitations on pushing or pulling. (R. At 311-12). Dr. Sippel also found that plaintiff could never climb or balance as part of his job, and that he had frequent problems with fingering and feeling objects. (Id. at 312-13). This opinion contradicted a May 20, 2004 statement from Dr. Sippel that found no physical or environmental limitations caused by plaintiff's condition. (Id. at 267-68). The ALJ gave Dr. Sippel's second assessment limited weight because the opinions were not consistent and the medical records did not indicate a deterioration of plaintiff's condition that would justify a fundamentally different diagnosis. (Id. at 16).

Plaintiff contends that ample medical evidence existed to support the change in Dr. Sippel's opinion. (Plaintiffs Brief in Support of Objection to Report and Recommendation of the Magistrate Judge (Doc. 13) at 8-9). We agree. Even a sampling of the medical evidence in the case helps explain why Dr. Sippel may have changed her assessment of plaintiff's condition between May of 2004 and March of 2005. Before the May assessment, plaintiff offered various to complaints to his doctors of slow-healing wounds and pain, but little in the way of problems with touch and feeling in his extremities that would necessitate treatment by a neurologist. On

14

September 15, 2003, for example, Dr. Paul D. Campbell, a family physician, examined plaintiff. (R. at 309-10). Plaintiff complained of a slow-healing foot ulcer. (Id. at 309). Dr. Campbell recommended an over-the-counter medication to heal the ulcer, but noted that plaintiff did not show signs of complications from diabetes such as "nephropathy, neuropathy, coronary artery disease, or gastroparesis." (Id. at 310). Plaintiff continued to see doctors regularly for his diabetes and for wounds to his feet and legs related to that condition, and on March 26, 2004 received a prescription for custom-made shoes to help alleviate an ulcer on his foot. (Id. at 298). His doctor reported that plaintiff on his own had stopped taking neurontin, a medication for neuropathy, on his own. (Id.).

Subsequent doctor's visits demonstrate a worsening of plaintiff's condition that led Dr. Sippel to change her assessment. At a visit on April 13, 2004, Dr. David C. Smith II referred plaintiff to a neurologist to help him with his "neuropathic pain." (Id. at 296). On June 22, 2004, Dr. Smith recommended that plaintiff continue to use Neurontin. (Id. at 294). On July 21, 2004 Dr. Sippel reported that plaintiff informed her he had seen a neurologist, and that Dr. Vu found that "peripheral neuropathy" related to diabetes was likely. (Id. at 293). For the first time, the doctor's description of the appointment included the notation that her patient had arrived for a "follow-up of poorly controlled type 2 diabetes mellitus with peripheral neuropathy." (Id. at 293). Dr. Sippel reported that during their September 1, 2004 visit, plaintiff's physical complaints were confined to "persistence of his peripheral neuropathy which

15

occasionally keeps him up at night." (Id. at 291).  She increased his dose of neurontin in order to decrease plaintiff's pain from this condition.  (Id.).  On March 9, 2005, Dr. Sippel reported that plaintiff "continue[d] to have significant neuropathic pain with 'burning' in his lower extremities from the knees down and upper extremities in his hands and forearms." (Id. at 285).

Even without adding to this evidence reports from a treating neurologist and plaintiff's testimony about decreased sensation in his extremities and increased discomfort from standing and walking,[2] we would be convinced that the ALJ erred in giving limited weight to Dr. Sippel's March 2005 assessment of plaintiff's RFC.  In addition, the ALJ improperly refused to credit the treating medical personnel's opinion and substituted her own assessment of the severity and changing nature of the plaintiff's condition for expert perspective on the matter.  The law provides that "an ALJ may not make speculative inference from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (internal quotations ommitted).  Here, the ALJ concluded that Dr. Sippel's opinion should not be given extensive weight, claiming it contradicted earlier opinions and the opinions of other doctors.  We find that plaintiff complained consistently of complications from his diabetes that grew worse over time.  An opinion on RFC that finds greater

---

[2]See Section C below.

Case 3:05-cv-02122-JMM    Document 16    Filed 09/29/06    Page 17 of 23


restrictions after a worsening of plaintiff's condition is not contradictory and should have been given greater weight from the ALJ.

We do not, however, find this error fatal to the ALJ's ultimate determination in this matter. The ALJ claimed to have given limited weight to Dr. Sippel's assessment in determining plaintiff's eligibility for disability benefits, but she found that the claimant could "perform sedentary work activity, which requires lifting and carrying up to 10 pounds and standing and/or walking up to 2 hours of an 8-hour workday, with normal breaks." (R. at 18). The ALJ also determined that the plaintiff could "occasionally climb stairs and balance," but that he could "never use foot/leg controls bilaterally, climb ropes, ladders or scaffolding, kneel, crouch or squat or crawl." (Id.). The ALJ found that the plaintiff could not work in areas of loud noise, "in high exposed places," or near fast-moving machinery. (Id.) These findings essentially adopt Dr. Sippel's March 9, 2005 assessment of plaintiff's RFC, whatever weight the ALJ claimed to afford that finding. Compare R. 18 and R. 311-13. While the ALJ found that plaintiff had more ability to climb stairs and balance than Dr. Shippel thought he did, the ALJ gave him less credit for ability to kneel, crouch, or squat than the doctor would have. (Id.). Accordingly, the ALJ's disability determination would not have changed had she properly credited Dr. Shippel's RFC assessment, and we find harmless any error in this regard.

## C. The Magistrate Judge Erred in Finding that the ALJ's denial was supported by substantial evidence in the record

The plaintiff argues that the Magistrate Judge erred in finding that the ALJ's disability denial was supported by substantial evidence in the record because the Magistrate Judge failed to consider that plaintiff's pain and complaints of limitation from that pain, which plaintiff contends were documented amply in the record. Apparently, the plaintiff believes that if the ALJ had properly credited this evidence of his pain and its impact on his ability to function the judge would have been forced to come to the opposite conclusion on plaintiff's eligibility for disability.

Plaintiff did provide a great deal of evidence that his condition caused him pain and limited his ability to work. In his application for disability benefits, completed on April 19, 2004, plaintiff claimed that he became dizzy and weak and experienced severe pain if he exerted himself more than usual on a particular day. (R. at 156). He found himself unable to stand long enough to prepare his meals, and could not assist his girlfriend with any housework. (Id.). While able to mow his lawn and drive a car for thirty minutes or less, the plaintiff was in too much pain to vacuum the house. (Id. at 157). His pain prevented him from going grocery shopping, or from carrying more than one or two small bags into the house when his girlfriend returned. (Id.).[3] Plaintiff sat through his showers because of the pain he felt in his legs. (Id. at 159). When he stood up, plaintiff had to stand still for a minute before walking;

---

[3]Plaintiff's claims in this area are not entirely consistent. He claims that he cannot unload any grocery bags from the car, but then says he can carry one or two small bags to the house. R. at 157. He also says that he is in too much pain to do any work vacuuming the house, but admits that he is able to mow a 25' x 150' lawn, albeit with considerable rest.

otherwise, he would get dizzy or even black out. (<u>Id.</u> at 159).

At his 2005 administrative hearing, the plaintiff testified that he could not "feel things very well in my feet." (R. at 64). He sometimes walked around his home with a splinter in his foot, failing to notice anything amiss until he made a visual examination of his feet. (<u>Id.</u>). Plaintiff also had "constant" and "shooting" pain in his feet and legs that extended into his thighs. (<u>Id.</u>). This pain occurred nightly, and it often became "unbearable." (<u>Id.</u> at 65). The plaintiff could sit "for a long period of time," but he had "constantly" to "readjust [him]self." (<u>Id.</u> at 72). Even when he sat, the plaintiff found he would "get dizzy in general and need to go lay down." (<u>Id.</u>). Standing increased this pain; walking alleviated it a bit. (<u>Id.</u>). Plaintiff could stand only for an hour before the pain forced him to sit down. (<u>Id.</u>). He sometimes took his dog for walks, but was forced to stop and stand after ten minutes or so because of pain in his feet and legs. (<u>Id.</u> at 66). Plaintiff's fingers also bothered him; he had less feeling than he previously had in them, and had difficulty grabbing small objects. (<u>Id.</u> at 68). Pain in his hands and arms also bothered the plaintiff. (<u>Id.</u>). He had "burning, constant pain," compounded by "sharp, intermittent, searing pains." (<u>Id.</u>). These pains prevented the plaintiff from living an especially active life: he spent most of his days resting, watching television, or surfing the internet. (<u>Id.</u> at 62). His pain had apparently forced him to give up playing with his band by May 2005. (<u>Id.</u> at 65).

Doctors' reports confirm that plaintiff suffered from these symptoms. Dr. Vu, the neurologist who treated the plaintiff in June 2004, reported that over the past six

19

months plaintiff had complained of "being extremely weak with a burning, tired sensation after lifting heavy objects." (R. at 317).  Plaintiff did not feel an ulcer that developed on his toe while he was working construction.  (Id.).  His arms felt weak and he sometimes had trouble turning keys and doorknobs.  (Id.).  Fatigue and pain limited plaintiff's ability to walk, and "shooting pains in his legs" kept him up at nights. (Id.).  A physical examination revealed that while the plaintiff had "normal strength, tone and bulk in all extremities," he had difficulty perceiving "light touch, pinprick, and temperature" from his feet to his mid-legs.  (Id. at 318).  Similar problems occurred in plaintiff's hands.  (Id.).  Plaintiff's reflexes were also decreased or lacking in his toes and ankles.  (Id.).  An electrodiagnostic exam performed in July 2004 confirmed that evidence of sensory peripheral neuropathy existed.  (R. at 321).  Dr. Vu noted persistent problems with tingling sensations in plaintiff's arms and legs after an examination on March 30, 2005.  (Id. at 343).  Plaintiff's complaints had come to include "a burning pain in his toes and fingers, as if he is holding them over a flame." (Id.).

Dr. Olufunsho Faumyiwa, an endrocrinologist who treated the plaintiff, reported similar conditions that emerged as side effects of diabetes.  (Id. at 334-47). The plaintiff had noticed sharp pain while walking, and complained of occasional dizziness, numbness in his hands and feet, and "occasional sharp pain anywhere in the body."  (Id. at 334).  Dr. Faumyiwa's physical examination revealed that plaintiff possessed "normal power and coordination," but that he had a loss of feeling in his

20

big toes and dissipated deep tendon reflexes. (Id. at 335). Dr. Famuyiwa's examination on February 18, 2005 revealed plaintiff suffered from "multiple chronic complications of diabetes," including retinopathy, neuropathy, erectile dysfunction, dermopathy." (Id. at 327). The doctor also noted that plaintiff suffered from goiter as well as poorly controlled diabetes. (Id. at 326-27). Plaintiff's family physician also consistently noted complaints about pain in his feet and hands, as well as other discomforts related to his illness. (Id. at 285, 287, 288, 294, 295).

While plaintiff may be correct that the ALJ did not fully credit his complaints of pain, the ALJ did consider the plaintiff's complaints of pain in his extremities in concluding that he was ineligible for disability benefits. The ALJ credits plaintiff's complaints of pain and tingling in his extremities, as well as doctors' findings of decreased sensation in those areas. (Id. at 16). At the same time, however, the ALJ notes that plaintiff's "range of motion and motor strength have been normal and he has not had edema." (Id.). This finding reinforced the ALJ's determination that plaintiff's impairment, though severe, "is not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (Id. at 15). Since the ALJ did not base her determination of plaintiff's disability on his reported pain, we cannot reverse her finding for failing fully to consider plaintiff's complaints of pain from the side effects of diabetes.

Since the ALJ based her finding of no disability not on plaintiff's pain but on his

reported motor function, we will examine whether the ALJ had substantial evidence for those conclusions.  We find that there is substantial evidence to support the ALJ's finding that plaintiff failed to have "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement of gait and station." (Id.).  Dr. David C. Smith, for instance, reported on June 22, 2004 that plaintiff's "range of motion in both upper and lower extremities [was] equal and shows no deficits." (Id. at 294).  Dr. Vu's 29 June 2004 examination revealed that plaintiff had "sensory defects," but that "no motor involvement is noted." (Id. at 318).  Dr. Famuyima's December 17, 2004 exam found the plaintiff enjoyed "normal power and coordination." (Id. at 335).  Dr. Vu's March 29, 2005 examination revealed that plaintiff's "gait and tandem walking are normal." (Id. at 344)  The plaintiff offers no evidence to contradict these doctors' findings. The ALJ had substantial evidence to conclude that plaintiff lacked the necessary motor function deficiencies for a finding of presumptive disability in this case.

Therefore, for the foregoing reasons, we will adopt the Magistrate Judge's Report and Recommendation.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHAWN M. MITCHELL,          :     No. 3:05cv2122
              Plaintiff     :
                            :     (Judge Munley)
                            :     (Magistrate Judge Smyser)
              v.            :
                            :
JO ANNE BARNHART,           :
COMMISSIONER OF SOCIAL      :
SECURITY,                   :
              Defendant     :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this _29th_ day of September 2006, it is hereby ordered as follows:

1) The plaintiff's  objections (Doc. 13) are hereby **OVERRULED**;

2) The report and recommendation (Doc. 12) is adopted;

3) Plaintiff's Social Security appeal is **DENIED**; and

4) The clerk is directed to close the case.


                            **BY THE COURT:**


                            **s/ James M. Munley**
                            **JUDGE JAMES M. MUNLEY**
                            **United States District Court**